UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KEITH A. ROBERTS,

        Plaintiff,

v.                                              Case No. 15-C-1232

NANCY BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER (REVISED)[1]

*Pro se* Plaintiff Keith Roberts filed this action challenging the decision of the Commissioner of Social Security denying him disability benefits. For the reasons given below, the Commissioner's decision will be affirmed.

## BACKGROUND

**A. Procedural History**

This is a strange case with an even stranger procedural history. On January 6, 1993 Roberts filed an application for supplemental security income (SSI). R. 326. Applications for SSI are also deemed applications for disability insurance benefits (DIB) under the Social Security Act. R. 321. Eligibility for DIB and SSI are similar in that both require a finding of disability. They differ, however, in that DIB requires that the claimant meet the earnings requirement for insured status under the Social Security Act on the date of the onset of disability in order to qualify. In addition,

---

[1] Lightly edited to correct minor typographical errors and to add minor clarifications.

a person who qualifies for DIB is entitled to benefits regardless of income or assets. To receive SSI, a claimant must be indigent.

On June 5, 1993, SSA notified Roberts' that his application for SSI was denied because it had determined that his condition was not severe enough to keep him from working. R. 321. At the same time, Roberts was notified that he was not eligible for Social Security DIB apparently because his insured status had expired. He was also told that if he disagreed, he had the right to appeal. R. 321.

Roberts sought further review of the decision denying his application for SSI, and on May 2, 1994, ALJ Eric Curtis found that Roberts was disabled as of January 6, 1993, and awarded SSI benefits. R. 326–29. ALJ Curtis found that Roberts' coronary artery disease, shortness of breath, back pain, dysthymia, and a personality disorder were severe impairments that prevented him from performing the full range of sedentary work. With a limited RFC and considering his age, education and work experience, ALJ Curtis concluded that Roberts could not perform past relevant work and any other jobs that existed in significant numbers. R. 327. Roberts was thereafter awarded SSI benefits, but he did not appeal the denial of his claim for DIB.

On March 8, 2002, Roberts filed another application for Social Security DIB, alleging a disability onset date of October 15, 1981. R. 65. Following the denial of his application initially and on reconsideration, Roberts requested a hearing before an administrative law judge (ALJ). R. 37–45. ALJ Ira S. Epstein conducted a hearing on March 23, 2004. R. 401–31. On May 27, 2004, ALJ Epstein found in Roberts' favor. R. 302–06. After reviewing Roberts' earning records, ALJ Epstein concluded he was insured from July 1, 1965 through September 30, 1982, and from July 1, 1983, through June 30, 1985. R. 302. The ALJ noted the medical records and testimony

document a long history of PTSD intertwined with depression, an explosive personality disorder, and a mixed personality disorder with antisocial and borderline features. R. 303. Although the ALJ found that Roberts' mental problems were severe prior to 1980, he determined Roberts had not been under a disability until January 27, 1984, but was nevertheless entitled to a period of disability from that date based on the last insured date he had calculated. R. 306.

On July 9, 2004, Roberts asked the Appeals Council to review ALJ Epstein's favorable decision, claiming that while ALJ Epstein had awarded him benefits based on his March 2002 application, he should have reopened his January 1993 application. Roberts claimed that SSA erred in denying his January 1993 application for DIB because it did not have his earnings correctly posted when it denied his claim on the ground that his insured status had expired. R. 307. Reopening his January 1993 application would entitle Roberts to benefits back to January 1992, because DIB benefits can be paid up to 12 months before the application is filed. 42 U.S.C. § 423(b).

On September 16, 2004, ALJ Epstein issued an amended decision in which he noted that it had recently been brought to his attention that the date he calculated that Roberts was last insured in his earlier decision was incorrect. Updated calculations established that Roberts was last insured on September 30, 1982, some sixteen months before the January 27, 1994 onset date of disability ALJ Epstein had found. This meant that Roberts was not entitled to DIB. "[A]fter careful review of the evidence and the previous testimony of the medical and vocational experts," however, ALJ Epstein determined in his amended decision that "[Roberts'] disability actually commenced on January 27, 1981, a date prior to [Roberts'] date last insured," and thus he was entitled to DIB. R. 347.

3

On March 5, 2005, Roberts wrote to the SSA's Appeals Management Center, again claiming that his award of DIB should relate back to his January 1993 application. R. 318–19. Roberts charged that SSA had "obviously miscalculated my Social Security credits and had determined the incorrect onset date as being January 6, 1993 instead of January 1981." R. 319. Roberts requested that he be awarded DIB "starting back to at least 1975." R. 318.

On April 15, 2005, the Appeals Council vacated ALJ Epstein's decision and remanded the case for further proceedings. R. 336–37. The Appeals Council concluded there was "no basis for granting the claimant's request for review of the Administrative Law Judge's decision." R. 336. At the same time, however, the Appeals Council found that there was good cause to reopen the favorable decision on Roberts' March 2002 application because it contained an error on its face as defined in 20 C.F.R. § 404.989(a)(3). Apparently unaware that ALJ Epstein had already corrected his error and amended his original decision, the Council noted that he had erroneously calculated Roberts' last insured date based on an incorrect date of birth and that in fact, he was not insured as of January 27, 1984, when ALJ Epstein had originally determined his disability commenced. The Council also acknowledged Roberts' claim that in 1993 the SSA had miscalculated his Social Security credits because wages he received for employment at Continental Building Services in 1981 were not reported to his earnings record. The Council concluded that "further investigation is needed to complete the administrative record and properly determine the correct date for which claimant was last insured for Social Security disability benefits." R. 336–37. It therefore vacated ALJ Epstein's decision and remanded the case so that a determination could be made whether Roberts was under a disability at any time when he met the special earnings requirements of the Social Security Act. R. 337.

The case then went to ALJ Robert Milton Erickson, who conducted a hearing on July 24, 2006. R. 432–84. Roberts testified at the hearing that he had worked for four to five months until approximately October 1981 for Continental Building Supplies as a supervisor for asphalt maintenance of a parking lot. If true, the additional credited quarters of earnings would have extended Roberts' insured status past September 30, 1982. ALJ Erickson rejected Roberts' testimony, however, because there were no records to support it. Roberts did not receive a W-2 form, nor did he file a tax return in 1981. Both Roberts and his wife were also vague in their testimony as to when he performed such work. R. 22.

Upon rejecting their testimony, the ALJ confirmed that Roberts' last insured date was September 30, 1982. R. 22. ALJ Erickson also concluded there was no basis for reopening the 1993 decision denying his application for DIB because he never appealed the ruling and the time to do so had long expired. R. 22. With Roberts' last insured date long past and no basis for reopening the denial of his 1993 application for DIB, ALJ Erickson concluded that Roberts was not entitled to DIB based on his March 2002 application. The Appeals Council denied Roberts' request for review of the ALJ's decision, making ALJ Erickson's decision the final decision of the Commissioner. R. 10–12.

Having exhausted his administrative remedies, Roberts filed a complaint in October 2011 in the United States District Court for the Eastern District of Wisconsin, seeking judicial review of the ALJ's decision. Both parties consented to have the case decided by a magistrate judge, and on December 17, 2012, Magistrate Judge William E. Callahan reversed the Commissioner's decision. R. 521–27. Magistrate Judge Callahan affirmed ALJ Erickson's finding that Roberts' date last insured was September 30, 1982, and left undisturbed ALJ Erickson's finding that there were no

5

grounds for reopening the decision denying the 1993 application for DIB. R. 524–25. The court concluded, however, that the ALJ's finding that Roberts was not disabled as of September 30, 1982 was not supported by substantial evidence or "any analysis." R. 525.

It is not clear why the denial of the 1993 application for DIB was never asserted as a bar to Roberts' March 2002 application for DIB predating that application. *See Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) ("Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994."). In any event, the case was remanded for further proceedings.

ALJ Wayne L. Ritter held a hearing on November 8, 2013. R. 639–69. In a written decision dated January 29, 2014, ALJ Ritter concluded Roberts was not under a disability at any time during January 27, 1981 through the date last insured of September 30, 1982. R. 501. That decision became the final decision of the Commissioner when the Appeals Council denied further review on August 10, 2015. Roberts thereafter filed this action for judicial review. Before undertaking that review, I will address an issue the court raised while the case was pending.

**B. Judicial Notice of Prior Fraud Conviction**

As I noted in my December 22, 2016 Order Regarding Judicial Notice, Roberts was convicted in this court for wire fraud arising out of his fabrication of a story dating to his military service in order to obtain benefits from the Veterans Administration (VA). In short, he alleged that he suffered from PTSD as a result of personally witnessing a close friend becoming pinned and crushed under a C-54 cargo plane on February 4, 1969. As the Seventh Circuit summarized the case, "[t]he Government produced a plethora of evidence that suggested Mr. Roberts' statements to the VA were false. . . . In addition to eyewitness testimony contradicting his version of events,

6

the Government introduced evidence that Mr. Roberts had altered his story on a number of occasions." *United States v. Roberts*, 534 F.3d 560, 570 (7th Cir. 2008). The conviction also led to the severance of Roberts' veteran's service-connected benefits, itself the subject of litigation all the way to the United States Court of Appeals for the Federal Circuit. *See Roberts v. Shinseki*, 647 F.3d 1334, 1339 (Fed. Cir. 2011).

I asked the parties to this action whether it was appropriate for this court to take judicial notice of Roberts' criminal conviction, particularly because the fraud relates directly to the allegation of disability, and in fact the fraud was committed in an attempt to obtain government benefits, as here. In essence, to the extent his claim for Social Security benefits relies on an allegation of PTSD—and PTSD is the centerpiece of his claim that his disability existed as far back as 1981—it is arguably a continuance of the same fraud for which Roberts was convicted. R. 496 ("The claimant has maintained that he has a long history of anxiety, and that he developed PTSD in the military . . . .").

Roberts did not respond to the court's notice, and the Commissioner has indicated that it wishes to rest on its filings and does not believe it appropriate for the court to consider the fact that Roberts was convicted for fraud regarding the very issues that underlie this action. Of course, following that path would place the court in the unusual position of knowing that the primary cause of the "T" in Roberts' PTSD is fabricated—there was no genuine underlying "trauma"—yet also ignoring that information because the conviction for fraud was apparently not before the administrative agency.

Some courts have rejected the notion that judicial notice is automatically barred in actions reviewed on the administrative record. *Win-Tex Prod., Inc. v. United States*, 829 F. Supp. 1349,

1352 (Ct. Int'l Trade 1993); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (establishing factors courts must consider when weighing whether to allow matters outside the administrative record). These so-called *Esch* factors include the situation in which "the agency failed to consider factors which are relevant to its final decision." *Id.* Here, it is hard to imagine anything more relevant to an agency's decision than the fact that a jury of his peers concluded beyond a reasonable doubt that Roberts was lying about the incident that gives rise to his alleged PTSD, the lynchpin of his argument that his disability existed in 1981 or 1982. Given that the underlying fraud has infected the report of every psychologist and psychiatrist to review the medical record or interview Roberts, it could be argued that consideration of the conviction is essential to ensuring that the administrative proceedings are not rendered something worthy of mockery.

Even so, 42 U.S.C. § 405(g) governs this court's method of reviewing the agency's determination, and that section appears to limit the court to the administrative record itself: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Other courts have also frowned on taking judicial notice of matters outside the administrative record in Social Security cases. *Johnson v. Chater,* 108 F.3d 942, 946 (8th Cir. 1997) (collecting cases finding it inappropriate for courts to take judicial notice of extra-record facts). In part, this reluctance is due to the fact that § 405(g) itself contains a provision allowing a court to remand the action to the Commissioner for the consideration of new evidence: "The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action . . . ." Presumably, if the government so wished,

8

this court could remand the matter to the Commissioner for consideration of Roberts' conviction. Thus, it does not appear to be this court's role to consider Roberts' conviction in the first instance. Accordingly, I will accede to the Commissioner's request, take no notice of the earlier criminal case, and proceed to a consideration of the case focused only on the record before me.

## ANALYSIS

### A. Legal Standard

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ.

9

*Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 637 F.3d 299, 307 (7th Cir. 2010)).

**B. The Commissioner's Decision was Supported By Substantial Evidence**

Wholly aside from the issues regarding the veracity of the underlying claim for PTSD, it is evident that the ALJ's decision must be upheld. As the ALJ's opinion notes, there was scant evidence that Roberts was laboring under a disability in 1981 or 1982, the relevant time period in this appeal. The ALJ found that although there were fleeting interactions with mental health professionals in and around 1970, there was no formal diagnosis nor any suggestion of disability; in fact, Roberts finished his military service without incident and received an honorable discharge. R. 495. Any records of long-term mental impairments post-dated his alleged onset date by several years. For example, the notion that Roberts suffered from PTSD did not come into the medical records until 1998—well after the period in question.

The ALJ noted that the only medical evidence in the record came from sources who had not treated Roberts during the relevant time period. The ALJ's central conclusion is that, even if one accepts this *ex post facto* evidence from non-treating sources, there is still a dearth of contemporary evidence suggesting that Roberts suffered from any disabling symptoms as far back as 1981 or 1982. R. 497. In fact, what little evidence there is cuts against Roberts. For example, in 2003 Roberts wrote to Dr. Hastings to inquire about Hastings' opinions about Roberts' possible PTSD. Dr. Hastings, who had interviewed Roberts twice, in 1991 and 1993, had diagnosed Roberts with dysthymic disorder. R. 291. He did *not* diagnose PTSD at those times, and thus in response to Roberts' inquiry he concluded that "I could not say that it existed in 1991, and certainly could not

speculate on whether it was present in 1981, ten years before I had seen you." *Id.* The psychologist explained in some detail why he did not believe Roberts had PTSD in 1982:

> I have suggested several times that when I saw you in 1991 and in 1993, it was my opinion that you did not meet the criteria for that diagnosis [PTSD]. That opinion was shared by two other examiners—one within the VA, and another from outside—in three other evaluations, the last of which I believe was in 1995. You were, however, ultimately diagnosed with PTSD in 1998 . . . and it seems understood from that decision that the accident you witnessed was an important factor in the development of PTSD. I have no reason or evidence to argue that decision.
>
> How to explain the earlier discrepant diagnoses? To my knowledge, there is no assertion that PTSD has to occur "full blown" at one moment. Many patients have PTSD of a delayed onset. It may also be that the symptoms grow and elaborate at different rates over time. When I saw you . . . some of the key symptoms were not present. By 1998, they apparently were.

R. 292.

Thus, according to Dr. Hastings, even if Roberts later developed "delayed onset" PTSD, he was not suffering from PTSD in 1981 or 1982. The ALJ cited this report in reaching his conclusion that there was no evidence of PTSD during that time period. R. 497.

The ALJ also discounted the opinion, such as it was, of Dr. Derozier, a non-treating source who reviewed the medical record. Dr. Derozier, citing the 1969 hangar incident, concluded that "to a reasonable degree of psychological probability" Roberts "might have been diagnosed as PTSD had such diagnoses been extant and customary while he was in active duty." R. 263. It is unclear what it means to express an opinion that someone *might* have been diagnosed with PTSD, because it follows that the same person also might *not* have been so diagnosed. Was PTSD more likely than not, or just an abstract possibility? Dr. Derozier continued: "It is also my opinion that . . . subsequent psychosocial problems were possibly related to the traumatic loss of his friend and subsequent associated events." *Id.* Again, these unspecified problems "were possibly related" to

11

the loss of Roberts' "friend," another conclusion that is circumspect, at best. Finally, Dr. Derozier concluded "it would take the wisdom of Solomon to exactly sort out the contribution of individual factors in the history of this veteran. However, there appears to be a reasonable basis for bridging symtomology that extends back to the traumatic event in 1969, evidence for a delayed Post Traumatic Stress Disorder diagnosis which was entered at least three times since." *Id.* Read in the light most favorable to the claimant, Dr. Derozier's hedged opinion merely speculates that a "delayed" PTSD diagnosis "might" have been appropriate—which, in fact, is exactly what happened when treating providers eventually found that Roberts suffered from PTSD many years later. In short, Dr. Derozier does not conclude that the diagnosis would have been appropriate in 1981 or 1982, the crucial time period in question here.

ALJ Ritter also questioned the testimony of Dr. Lynch, a consultant who testified at Roberts' 2004 hearing. ALJ Epstein, who had earlier found in Roberts' favor, concluded that Lynch "testified that the primary mental disorder was post traumatic stress disorder. He indicated that his evaluation of the record led him to find that since at least 1981 the claimant suffered from poor to fair ability to perform the mental tasks required by unskilled work, and moderate to marked impairment of ability to maintain concentration, persistence and pace." R. 303. However, as ALJ Ritter found, there actually was no medical documentation of such a condition existing as far back as 1981. Dr. Lynch's testimony, upon which ALJ Epstein relied in 2004, is at best equivocal on the topic. R. 425–30. The testimony does not even mention Roberts being under a PTSD diagnosis *in 1981 or 1982*, and in fact it reflects the "absence of psychiatric diagnosis prior to 1987," and that one would need "the wisdom of Solomon" (echoing Dr. Derozier) to figure it out given the absence of treatment during that period. R. 425–26. Dr. Lynch then observed that Dr. Hastings, the VA

12

psychologist who had twice seen Roberts, "found no diagnosis of post-traumatic stress in both 1991 and 1993." R. 426. It is true that Dr. Lynch then testified that Roberts would have "moderate" difficulties in concentration, persistence and pace and only a fair ability to relate to coworkers, the public, managers, etc. R. 427–29. But this line of testimony does not support the existence of a disability in 1981 or 1982. In fact, Dr. Lynch clarified at one point:

> A   Your question is from '81 to '85.
>
> Q   Right. If you don't know or you know [sic], you can't make an assumption.
>
> A   That's my problem, Judge.

R. 429.

In short, nothing about Dr. Lynch's hearing testimony would lead one to conclude that he believed Roberts was under a disability in 1981 or 1982. At most, he apparently believed Roberts would have moderate difficulties in several work-related abilities *at the time of the hearing* or at some other unspecified period. Dr. Lynch noted the problem of the absence of contemporaneous records, as well as the conclusion of examining doctors like Dr. Hastings that Roberts did *not* have PTSD in 1991 or 1993, much less in 1981 or 1982. From his brief testimony it is unclear why ALJ Epstein found a disability in the first place. These and other problems were ably addressed by ALJ Ritter, who underlined his central conclusion: "The undersigned emphasizes that the opinions of Drs. Bommakanti[2], Derozier, and Dr. Lynch are not from treating sources, were all rendered many years after the relevant period, and definitely represent surmise as they are not based on any

---

[2] Dr. Chandra Bommakanti wrote a two-sentence letter to Roberts: "Your Post Traumatic Stress Disorder is from the traumatic event you were exposed to in Italy. It did interfere with your life style, marriage and employment. Also, in my opinion, PTSD influenced your depression, alcoholism and personality disorder." R. 290. From this barebones opinion it is impossible to say anything about whether Roberts was diagnosable with PTSD in 1981 or 1982.

13

significant medical evidence prior to the date last insured. <u>The actual treatment evidence for that period provides no objective basis for even any long-term diagnosis, and certainly not for any disabling symptoms/manifestations.</u>" R. 497 (emphasis added). This was an eminently reasonable conclusion.

Roberts believes the ALJ was "playing doctor" by reaching the conclusion he reached, but in reality the ALJ was simply assessing the available evidence in the record, which is exactly what an ALJ is tasked with doing. Roberts also believes the ALJ should have obtained an independent medical opinion, but it is unclear what that would have accomplished. As Dr. Hastings noted, it was impossible *in 1993* to conclude that Roberts suffered from PTSD in 1982. More than twenty years have passed since then, and thus it would be pure speculation for yet another medical provider to opine as to whether Roberts experienced PTSD in 1981 or 1982. And of course Roberts does not explain how he would establish his PTSD without again repeating the story about the underlying "trauma" that gave rise to the PTSD diagnosis in the first place. In short, the ALJ's conclusions are supported by substantial evidence. The Commissioner's decision is therefore affirmed.

## C. Motions to Supplement

Two matters remain. Roberts has filed two separate motions to supplement the record. The first seeks to add a transcript of the 1994 hearing before ALJ Curtis and, in particular, the testimony of VE William Dingess. Roberts contends that VE Dingess' 1994 testimony is relevant because it can be used to impeach his testimony at the 2013 hearing before ALJ Ritter. The second motion seeks to introduce some 88 pages of documents relating to Roberts' claims for VA benefits, including: (1) the report of Robert L. Marcellino, Psy.D., who completed a psychological

examination of Roberts on May 21, 2015, more than a year after ALJ Ritter issued his decision; (2) a March 14, 2006 report of a forensic examination assessing Roberts' competency to proceed and mental state at the time of the alleged offense completed in response to this court's order in the above-mentioned criminal prosecution for wire fraud; and (3) the April 23, 2010 decision of the United States Court of Appeals for Veterans Claims affirming in part and reversing in part the decision to sever his benefits for fraud.

Both motions are denied. With respect to the first, assuming the SSA even has a transcript of a hearing held some thirty-three years ago, it would have no bearing on the issue that was before ALJ Ritter. In 1994, the question ALJ Curtis decided was whether Roberts was disabled as of January 6, 1993, the date he filed his application for SSI. At the hearing before ALJ Ritter on November 8, 2013, the question was whether Roberts was disabled as of his last insured date of September 30, 1982. Roberts' RFC in 1993 was significantly different than the RFC that ALJ Ritter found he had in 1982. The testimony of VE Dingess in the earlier hearing would have no bearing on the latter.

As for the second motion, both the March 14, 2006 forensic report in Roberts' criminal case and the April 23, 2010 decision of the United States Court of Appeals for Veteran Claims were available to Roberts before his November 8, 2013 hearing before ALJ Ritter. If either was material to the issues to be decided, they could have been presented then. The May 21, 2015 report by Dr. Marcellino constitutes new evidence that did not exist at the time ALJ Ritter issued his decision and thus could not have been offered earlier. The proper step would be to remand the case and allow the Commissioner to consider Dr. Marcellino's report if it was material and there was good cause for the failure to incorporate the evidence into the record in a prior proceeding. *Veal v. Bowen*, 833

F.2d 693, 699 (7th Cir. 1987). In fact, none of the evidence with which Roberts seeks to supplement the record bears on the only issue in the case—whether Roberts was disabled within the meaning of the Act on or before September 30, 1982. Roberts points to nothing in the 88 pages of documents accompanying his motion that bears on the issue, and even if Dr. Marcellino had addressed the onset of Roberts' alleged disability, his opinion some 35 years later based on nothing more than Roberts' uncorroborated account of his service experience, would add nothing to his claim. For these reasons, Roberts' motions to supplement the record (ECF Nos. 21 and 23) are denied.

## CONCLUSION

Almost 25 years after Roberts first applied for Social Security disability benefits based on a claim of disability that allegedly arose more than ten years before that, precipitated by an event that allegedly occurred almost 48 years ago, it is time to put an end to this process. The decision of the Commissioner is affirmed.

**SO ORDERED** this 13th day of February, 2017.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court